**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**ST. LOUIS DIVISION**

| | | |
|---|---|---|
| JASON VAHLE, as parent, guardian and next friend of K.V., a minor, individually and on behalf of all others similarly situated | : : : : | **CASE NO.:** |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **CLASS ACTION COMPLAINT** |
| | : | |
| BJC HEALTH SYSTEM | : | **JURY TRIAL DEMANDED** |
| | : | **AS TO ALL COUNTS** |
| | : | |
| Serve: CSC-Lawyers Incorporating Service Co., | : | |
| 221 Bolivar Street | : | |
| Jefferson City, MO 65101 | : | |
| | : | |
| Defendant. | : | |
| | : | |

**CLASS ACTION COMPLAINT**

1.      Plaintiff JASON VAHLE, as parent, guardian and next friend of K.V., a minor, individually and on behalf of all others similarly situated, bring this action against Defendant BJC HEALTH SYSTEM ("BJC" or "Defendant"), a Missouri non-profit corporation, to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiff makes the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record:

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000.00

exclusive of interest and costs, and members of the Proposed Class (such as named Plaintiff Vahle) are citizens of states different from Defendant.

3.    Also, this Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the Plaintiffs assert claims that necessarily raise substantial disputed federal issues under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the Federal Trade Commission Act (15 U.S.C. § 45). *See, e.g.*, infra at ¶¶ 48-54, 60-63.

4.    Defendant has sufficient minimum contacts in Missouri, as it is organized as a nonprofit corporation under the laws of the State of Missouri, and conducts the majority (if not all) of its business in the State of Missouri, thus rendering the exercise of jurisdiction by this Court proper and necessary.

5.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to these claims occurred in this District.

## NATURE OF THE ACTION

6.    This class action arises out of the recent cyberattack and data breach ("Data Breach") at Defendant's medical facilities. As a result of the Data Breach, Plaintiff and approximately 287,876 Class Members suffered ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the attack. In addition, Plaintiffs' and Class Members' sensitive personal information—which was entrusted to Defendant—was compromised and unlawfully accessed due to the Data Breach. Information compromised in the Data Breach includes names, demographic information, dates of birth, Social Security numbers, driver's license or identification card numbers, employment information, health insurance information, medical information, other

2

protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and additional personally identifiable information ("PII") and protected health information ("PHI") that Defendant collected and maintained (collectively the "Private Information").

7.    Plaintiff brings this class action lawsuit to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

8.    Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

9.    In addition, Defendant and its employees failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant properly monitored its property, it would have discovered the intrusion sooner.

10.    Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

11.    Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, e.g., opening new financial accounts in Class Members'

names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' health information to target other phishing and hacking intrusions based on their individual health needs, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

12.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

13.     Plaintiff and Class Members may also incur out of pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

14.     Plaintiff seeks to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

15.     Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

**PARTIES**

16.     Plaintiff  Jason Vahle, and the minor K.V.,  are and, at all times mentioned herein, were individual citizens of the State of Illinois residing in the City of O'Fallon.

17.     Defendant BJC is a non-profit health system with its principal place of business at 4901 Forest Park Avenue, Suite 1200, St. Louis, Missouri 63108.

**DEFENDANT'S BUSINESS**

18.     Defendant BJC HealthCare is one of the largest nonprofit health care organizations in the United States, and is focused on delivering services to residents primarily in the greater St. Louis, southern Illinois and mid-Missouri regions. [1]

19.     Defendant operates 15 hospitals and multiple community health locations.

20.     Defendant provides medical care, treatment, and attendant services, including inpatient and outpatient care, primary care, community health and wellness, workplace health, home health, community mental health, rehabilitation, long-term care and hospice.

21.     In the ordinary course of receiving treatment and health care services from BJC, patients are required to provide sensitive, personal and private information such as:

a.     Name, address, phone number and email address;

b.     Date of birth;

c.     Demographic information;

d.     Social Security number;

e.     Information relating to individual medical history;

f.     Insurance information and coverage;

g.     Information concerning an individual's doctor, nurse or other medical providers;

h.     Photo identification;

i.     Employer information; and

j.     Other information that may be deemed necessary to provide care.

k.     Defendant also gathers certain medical information about patients and creates records of the care it provides to them.

---

[1] https://www.bjc.org/About-Us/Facts-Figures

22.     Additionally, Defendant may receive private and personal information from other individuals and/or organizations that are part of a patient's "circle of care," such as referring physicians, patients' other doctors, patient's health plan(s), close friends, and/or family members.

23.     Defendant publishes on its website a page entitled "Patient Rights and Responsibilities," which states that patients like Plaintiff and the Class Members have a right to "privacy of your health information."[2]

24.     All of Defendant's employees, staff, entities, clinics, sites, and locations may share patient information with each other for various purposes without a written authorization, as disclosed in the BJC Healthcare Joint Notice of Privacy Practices (the "Privacy Notice").[3] The current privacy notice has an effective date of April 14, 2003, with the latest revision coming in July 2015.

25.     The Privacy Notice is provided to every patient upon request and is posted on Defendant's website. Defendant also notes that it has a policy "To give you this Notice of our Privacy Practices and legal duties with respect to protected health information."[4]

26.     Because of the highly sensitive and personal nature of the information Defendant acquires and stores with respect to its patients, BJC promises to, among other things: A) to ensure that health information that identifies you is kept private; B) to follow the terms of the Privacy Notice that is currently in effect; C) to make a good faith effort to obtain from patients a written acknowledgement that they have received or been given an opportunity to receive the Privacy Notice, and; D) to notify patients in writing within 60 days in the event patient health information

---

[2] https://www.bjc.org/For-Patients-Visitors/Patient-Rights-Responsibilities
[3] https://www.bjc.org/Portals/0/Content/HIPAA/BJC22094_BJC%20NPP%20COMMUNITY_fin.pdf?ver=2016-03-09-144707-350
[4] *Id.*

is compromised by BJC HealthCare, one of its affiliates, or by someone with whom we have contracted to conduct business on our behalf.[5]

27.    The Privacy Notice also provides that written authorization will be requested for all uses and disclosures of protected health information or confidentiality, other than those uses expressly set out in the Privacy Notice.[6]

28.    As its Privacy Policy makes clear, Defendant acquires, collects, and stores a massive amount of personally identifiable information on its patients.

29.    As a condition of receiving medical care and treatment at its hospital and other facilities, Defendant requires that its patients entrust it with highly sensitive personal information.

30.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

31.    Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

32.    Plaintiff and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

**PLAINTIFF'S EXPERIENCE**

33.    On the first occasion on which he received medical care and treatment from Defendant at St. Louis Children's Hospital[7] (the date of which is known to Defendant through its

_____

[5] *Id.*
[6] *Id.*
[7] According to Defendant's breach notice, St. Louis Children's Hospital was one of BJC's facilities whose patients were impacted by the Data Breach.
https://www.bjc.org/Newsroom/Article/ArtMID/5522/ArticleID/4438/Notice-to-Patients

own records), Plaintiff provided BJC with his name and the name of his minor child, address, phone number and email address; date of birth of the minor K.V.; demographic information (race, gender, etc.); his and the minor K.V.'s Social Security numbers; information relating to K.V.'s individual medical history; insurance information and coverage, and Plaintiff's employer information.

34.     On the first occasion on which the Plaintiff's minor K.V. received medical care and treatment from Defendant at St. Louis Children's Hospital  (the date of which is known to Defendant through its own records), Plaintiff was shown or given copies of the Privacy Notice containing the promise to keep the personal and health information of himself and his minor child private and confidential.

## THE CYBERATTACK AND DATA BREACH

35.     On March 6, 2020, BJC learned that an unauthorized person or persons gained access to three (3) BJC employee email accounts in a targeted cyberattack, expressly designed to gain access to private and confidential data, including the PII and PHI of patients like Plaintiffs and Class Members.[8]

36.     The unauthorized third party gained access to the employee email accounts through a commonplace phishing attack, which is the most common form of targeted cyberattack.

37.     The email accounts accessed by the Data Breach contained emails and attachment containing some patients' names, dates of birth, medical record or patient account numbers, and limited treatment and/or clinical information, such as visit dates, provider names, medications,

_____

[8] https://www.hipaajournal.com/phishing-attack-at-bjc-healthcare-impacts-patients-at-19-hospitals/

diagnoses, and/or testing information. In some instances, patients' Social Security numbers and/or drivers' license numbers were also found in the accounts.[9]

38.　　The investigation was unable to determine whether the unauthorized person(s) actually viewed any email or attachment in the employee email accounts.[10]

39.　　The compromised email accounts contained messages and email attachments that included PII and PHI of at least 287,876 patients.

40.　　This data breach was particularly egregious because it was the second major data breach involving Defendant in approximately two years.  On January 23, 2018, BJC performed a security scan which revealed one of its servers had been misconfigured which allowed sensitive information to be accessed without authentication. Action was immediately taken to reconfigure and secure the server to prevent data from being accessed. The investigation revealed an error had been made configuring the server on May 9, 2017, leaving documents and copies of identification documents accessible. Highly sensitive information such as Social Security numbers, insurance cards, and driver's license numbers were left exposed on the internet for over eight (8) months' time, along with patients' names, addresses, contact telephone numbers, dates of birth, and treatment related information.[11]

41.　　The fact that this Data Breach occurred after Defendant's prior 2018 breach demonstrates that Defendant did not correct or improve its data security systems, practices, and procedures, failed to properly implement basic data security practices, and failed to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI.

---

[9] https://www.bjc.org/Newsroom/Article/ArtMID/5522/ArticleID/4438/Notice-to-Patients
[10] *Id.*
[11] https://www.hipaajournal.com/phi-of-33420-bjc-healthcare-patients-exposed-on-internet-for-8-months/

42.    Plaintiff believes his Private Information was stolen (and subsequently sold) in the Data Breach. While BJC stated it was "unable to determine" whether Plaintiff's and Class Members' Private Information was compromised during this unauthorized access, it acknowledged it could not rule out the possibility.

43.    Defendant has offered persons affected by the Data Breach complimentary credit monitoring and identity protection services,[12] thereby acknowledging that the risk of future injury is actual, choate, imminent and certainly impending.

44.    Despite being unable to rule out that the personal information of Plaintiffs and the Class Members was not compromised, Defendant did not begin to notify affected patients until May 5, 2020, nearly two months after the data breach was discovered.

45.    Defendant had obligations created by HIPAA, contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

46.    Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

47.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry preceding the date of the breach.

48.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller

---

[12] *Id.*

municipalities and **hospitals** are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[13]

49.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

50.     Phishing attacks of the type that the unauthorized persons used to gain access to Defendant's employee email accounts are among the oldest, most common, and well known form of cyberattacks.  "Phishing is a cyber attack that uses disguised email as a weapon. The goal is to trick the email recipient into believing that the message is something they want or need — a request from their bank, for instance, or a note from someone in their company — and to click a link or download an attachment."[14]  The fake link will typically mimic a familiar website and require the input of credentials. Once inputted, the credentials are then used to gain unauthorized access into a system. "It's one of the oldest types of cyber-attacks, dating back to the 1990s" and one that every organization with an internet presence is aware." [15]  It remains the "simplest kind of cyberattack and, at the same time, the most dangerous and effective."[16]

51.     Phishing attacks are generally preventable with the implementation of a variety of proactive measures such as purchasing and using some sort of commonly available anti-malware security software (such as the ubiquitous Malwarebites).  Most cybersecurity tools have the ability

---

[13] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (emphasis added).
[14] Frulingher, J., "What is phishing? How this cyber attack works and how to prevent it," CSO Online, April 7, 2020 https://www.csoonline.com/article/2117843/what-is-phishing-how-this-cyber-attack-works-and-how-to-prevent-it.html (last visited June 20, 2020)
[15] *Id.*
[16] *Phishing*, Malwarebytes, https://www.malwarebytes.com/phishing/ (last visited June 20, 2020).

to detect when a link or an attachment isn't what it seems.[17]  Other proactive measures include sandboxing inbound e-mail (i.e. an automated process that segregates e-mail with attachments and links to an isolated test environment, or a "sandbox," wherein a suspicious file or URL may be executed safely), inspecting and analyzing web traffic, penetration testing (which can be used to test an organization's security policy, its adherence to compliance requirements, its employees' security awareness and the organization's ability to identify and respond to security incidents), and employee education, just to name some of the well-known tools and techniques to prevent phishing attacks.

### DEFENDANT FAILS TO COMPLY WITH FTC GUIDELINES

52.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

53.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.  The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

---

[17] *Id.*

54.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

55.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

56.    These FTC enforcement actions include actions against healthcare providers like Defendant. *See, e.g., In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.")

57.    Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

58.    Defendant was at all times fully aware of its obligation to protect the PII and PHI of its patients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

13

## DEFENDANT FAILS TO COMPLY WITH INDUSTRY STANDARDS

59. As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

60. Several best practices have been identified that a minimum should be implemented by healthcare providers like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data, and; limiting which employees can access sensitive data.

61. A number of industry and national best practices have been published and should be used as a go-to resource when developing an institution's cybersecurity standards. The Center for Internet Security (CIS) released its Critical Security Controls, and all healthcare institutions are strongly advised to follow these actions. The CIS Benchmarks are the overwhelming option of choice for auditors worldwide when advising organizations on the adoption of a secure build standard for any governance and security initiative, including PCI DSS, HIPAA, NIST 800-53, SOX, FISMA, ISO/IEC 27002, Graham Leach Bliley and ITIL.[18]

62. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

---

[18] https://www.cisecurity.org/cis-benchmarks/cis-benchmarks-faq/

63.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; General Accounting Office (GAO) standards; the Federal Risk and Authorization Management Program (FEDRAMP); and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

## DEFENDANT'S CONDUCT VIOLATES HIPAA AND EVIDENCES ITS INSUFFICIENT DATA SECURITY

64.     HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

65.     Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

66.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA.  These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

67.     Defendants' Data Breach resulted from a combination of insufficiencies that demonstrate they failed to comply with safeguards mandated by HIPAA regulations.

## DEFENDANT'S BREACH

68.     Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer

15

systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system[19] to reduce the risk of data breaches and cyber-attacks;

b.    Failing to adequately protect patients' Private Information;

c.    Failing to properly monitor its own data security systems for existing intrusions;

d.    Failing to implement adequate and reasonable cyber-security procedures and protocols necessary to protect patient PII; Failing to disclose that they did not have adequately robust security practices to safeguard patient PHI and PII;

e.    Failing to take standard and reasonably available steps to prevent the Data Breach;

f.    Failing to implement and follow basic security procedures;

g.    Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

h.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

i.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

---

[19] A "data security system" is defined as "Generally, any means (technical, operational, or managerial) for keeping private the information contained in data that are transmitted, stored, or processed in a computer system."    https://www.encyclopedia.com/computing/dictionaries-thesauruses-pictures-and-press-releases/data-security-system  "Data security system" thus includes human factors (i.e. employee behavior, employee supervision, employee training).

j.      Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

k.      Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

l.      Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

m.      Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

n.      Failing to train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

o.      Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption")

p.      Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act, and;

q.      failing to adhere to industry standards for cybersecurity.

69.     As the result of computer systems in dire need of security upgrading (including without limitation the failure to implement commonly available cybersecurity tools whose function

includes protection against the well-known threat of phishing attacks), lack of training in the proper handling of phishing emails, inadequate procedures for handling emails containing viruses or other malignant computer code, and employees who opened files containing the virus or malignant code that perpetrated the cyberattack, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

70.    Accordingly, as outlined below, Plaintiff's and Class Members' suffered multiple forms of actual damages, and their daily lives were severely disrupted. What's more, they now face an increased risk of fraud and identity theft. Plaintiff and the Class Members also lost the benefit of the bargain they made with Defendant.

## PREVALENCE OF CYBER ATTACKS AND SUSCEPTIBILITY OF THE HEALTHCARE SECTOR

71.    Data breaches, including those perpetrated against the healthcare sector of the economy, have become widespread.  In 2016, the number of U.S. data breaches surpassed 1,000, a record high and a forty percent increase in the number of data breaches from the previous year. In 2017, a new record high of 1,579 breaches were reported, representing a 44.7 percent increase over 2016.  In 2018, there was an extreme jump of 126 percent in the number of consumer records exposed from data breaches.  In 2019, there was a 17 percent increase in the number of breaches (1,473) over 2018, with 164,683,455 sensitive records exposed.

72.    The number of data breaches in the healthcare sector skyrocketed in 2019, with 525 reported breaches exposing nearly 40 million sensitive records (39,378,157), compared to only 369 breaches that exposed just over 10 million sensitive records (10,632,600) in 2018.[20]

---

[20] https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf

73.    Phishing cyberattacks against healthcare organizations are targeted. According to the 2019 Health Information Management Systems Society, Inc. ("HIMMS") Cybersecurity Survey, "[a] pattern of cybersecurity threats and experiences is discernable across US healthcare organizations. Significant security incidents are a near-universal experience in US healthcare organizations with many of the incidents initiated by bad actors, leveraging e-mail as a means to compromise the integrity of their targets."[21] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From Social Security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[22]

74.    The exposure of highly personal and highly confidential healthcare related data is of great consequence to patients. As the ID Theft Center notes:

> Medical identity theft is costly to consumers. Unlike credit-card fraud, victims of medical identity theft can suffer significant financial consequences. Sixty-five percent of medical identity theft victims had to pay an average of $13,500 to resolve the crime. In some cases, they paid the health care provider, repaid the insurer for services obtained by the thief, or they engaged an identity-service provider or legal counsel to help resolve the incident and prevent fraud.
>
> Those who have resolved the crime spent, on average, more than 200 hours on such activities as working with their insurer or health-care provider.
>
> Medical identity theft can have a negative impact on reputation. Forty-five percent of respondents said medical identity theft affected their reputation mainly because of embarrassment due to disclosure of sensitive personal health conditions; 19 percent of respondents believed the theft caused them to miss out on career opportunities. Three percent said it resulted in the loss of employment.[23]

---

[21] https://www.himss.org/himss-cybersecurity-survey (last accessed June 20, 2020)

[22] https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last accessed June 20, 2020)

[23] https://www.idtheftcenter.org/medical-id-theft-costs-victims-big-money/#:~:text=Medical%20identity%20theft%20is%20costly,%2413%2C500%20to%20resolve%20the%20crime. (last accessed June 20, 2020)

## CYBERATTACKS AND DATA BREACHES CAUSE DISRUPTION AND PUT CONSUMERS AT AN INCREASED RISK OF FRAUD AND IDENTIFY THEFT

75.     Cyberattacks and data breaches at medical facilities like BJC are especially problematic because of the disruption they cause to the medical treatment and overall daily lives of patients affected by the attack.

76.     For instance, loss of access to patient histories, charts, images and other information forces providers to limit or cancel patient treatment because of the disruption of service.

77.     This leads to a deterioration in the quality of overall care patients receive at facilities affected by cyberattacks and related data breaches.

78.     Researchers have further found that at medical facilities that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[24]

79.     Similarly, cyberattacks and related data security incidents inconvenience patients. The various inconveniences patients encounter as a result of such incidents include, but are not limited to:

a.     rescheduling medical treatment;

b.     finding alternative medical care and treatment;

c.     delaying or foregoing medical care and treatment;

d.     undergoing medical care and treatment without medical providers having access to a complete medical history and records; and losing patient medical history.

80.     Cyberattacks are considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

---

[24] *See* https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203.

A breach under the HIPAA Rules is defined as "the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." See 45 C.F.R. 164.40.[25]

81.    Data breaches represent yet another problem for patients who have already experienced inconvenience and disruption associated with a cyberattack.

82.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GOA Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[26]

83.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[27]

84.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

85.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give

---

[25] *Id.*
[26] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Apr. 12, 2019) ("GAO Report").
[27] *See* https://www.identitytheft.gov/Steps (last visited April 12, 2019).

the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[28]



86.     Moreover, theft of Private Information is also gravely serious. PII/PHI is a valuable property right.[29] Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this

---

[28] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited June 20, 2019).

[29] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

87.     Theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[30] Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

88.     It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

89.     Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

---

[30] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited March 27, 2020).

90.     There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

91.     Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, coveted Social Security numbers were selling on the dark web for just $1 in 2016 – the same as a Facebook account. That pales in comparison with the asking price for medical data, which was selling for $50 and up.[31]

92.     Because of its value, the medical industry has experienced disproportionally higher numbers of data theft events than other industries. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## PLAINTIFF'S AND CLASS MEMBERS' DAMAGES

93.     To date, Defendant has done absolutely nothing to provide Plaintiff and the Class Members with relief for the damages they have suffered as a result of the Data Breach.

94.     Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

95.     Plaintiff's PII and PHI was compromised as a direct and proximate result of the Data Breach.

---

[31] https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.

96.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

97.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

98.     Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

99.     Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

100.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

101.    Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

102.    Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members overpaid for a service that was intended to be accompanied by adequate data security but was not. Part of the price Plaintiff and Class Members paid to Defendant was intended to be used by Defendant to fund adequate security of Defendant's

computer property and protect Plaintiff's and Class Members' Private Information. Thus, Plaintiff and the Class Members did not get what they paid for.

103.    Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial and medical accounts and records for misuse.

104.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

   a.    Finding fraudulent charges;

   b.    Canceling and reissuing credit and debit cards;

   c.    Purchasing credit monitoring and identity theft prevention;

   d.    Addressing their inability to withdraw funds linked to compromised accounts;

   e.    Taking trips to banks and waiting in line to obtain funds held in limited accounts;

   f.    Placing "freezes" and "alerts" with credit reporting agencies;

   g.    Spending time on the phone with or at a financial institution to dispute fraudulent charges;

   h.    Contacting financial institutions and closing or modifying financial accounts;

   i.    Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

   j.    Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

   k.    Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

105.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

106.    Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life, including what ailments they suffer, whether physical or mental—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

107.    As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and are at an imminent and increased risk of future harm.

108.    Although their PII and PHI was improperly exposed on March 6, 2020, and allegedly discovered the same day, affected patients were not notified of the Data Breach until some time after May 5, 2020, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach. As a result of Defendant's delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiffs and Class Members has been driven even higher.

## CLASS ACTION ALLEGATIONS

109.    Plaintiff, in accordance with and pursuant to FRCP Rule 23, brings this action on behalf of himself and a statewide class of similarly-situated individuals ("the Class").

110.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All persons whose PII was compromised as a result of the Data Breach announced by BJC on or about May 5, 2020 (the "Class").

Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

111.    <u>Numerosity</u>.  The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of approximately 287,876 patients of Defendant whose data was compromised in the Cyberattack.

112.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a)    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff' and Class Members' Private Information;

b)    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the cyberattack;

c)    Whether Defendant's data security systems prior to and during the cyberattack complied with applicable data security laws and regulations including, *e.g.*, HIPAA;

d)      Whether Defendant's data security systems prior to and during the cyberattack were consistent with industry standards;

e)      Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f)      Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g)      Whether computer hackers obtained Class Members' Private Information in the cyberattack;

h)      Whether Defendant knew or should have known that its data security systems, email handling policies and procedures, and monitoring processes were deficient;

i)      Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j)      Whether Defendant owed a duty to provide Plaintiff and Class Members with notice of this data breach, and whether Defendant breached that duty;

k)      Whether Defendant's conduct was negligent;

l)      Whether Defendant's conduct was *per se* negligent;

m)      Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion/invasion of privacy,

n)      Whether Defendant violated the Missouri Merchandise Practices Act, and;

o)      Whether Plaintiff and Class Members are entitled to damages, treble damages, civil penalties, punitive damages, and/or injunctive relief.

113.    Typicality. Plaintiff' claims are typical of those of other Class Members because Plaintiff' information, like that of every other Class member, was compromised in the cyberattack.

114.   <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff' Counsel are competent and experienced in litigating class actions.

115.   <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

116.   <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member.

117.   Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

## FOR A FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiff and All Class Members)

118.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 117 above, as if fully set forth herein.

119.    Defendant required Plaintiff and Class Members to submit non-public personal information in order to obtain medical services.

120.    By collecting and storing this data in its computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Plaintiff's and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

121.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

122.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its client patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

31

123.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).  Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

124.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

125.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

126.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.    Failing to adequately monitor the security of their networks and systems;

c.    Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

d.    Allowing unauthorized access to Class Members' Private Information;

e.     Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

f.     Failing to timely notify Class Members about the cyberattack so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

127.   It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members.  Further, the breach of security was reasonably foreseeable given the known high frequency of phishing attacks and data breaches in the medical industry.

128.   It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

129.   Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

130.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**FOR A SECOND CAUSE OF ACTION**
**INTRUSION UPON SECLUSION/INVASTION OF PRIVACY**
**(On Behalf of Plaintiff and All Class Members)**

131.   Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 117 as if fully set forth herein.

132.   The State of Missouri recognizes the tort of invasion of privacy and finds that the Restatement (Second) of Torts' distinctions among the four types of invasion of privacy are useful in deciding invasion of privacy claims.  *Corcoran v. Sw. Bell Tel. Co*., 572 S.W.2d 212, 214 (Mo.

App. 1978). One of the four types of invasion of privacy noted by the Restatement is an unreasonable intrusion upon the seclusion of another.

133. Plaintiff and Class Members had a reasonable expectation of privacy in the Private Information Defendant mishandled.

134. Defendant's conduct as alleged above intruded upon Plaintiff's and Class Members' seclusion under common law.

135. By intentionally failing to keep Plaintiff's and Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff's and Class Members' privacy by:

a. Intentionally and substantially intruding into Plaintiff' and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person; and

b. Intentionally publicizing private facts about Plaintiff and Class Members, which is highly offensive and objectionable to an ordinary person; and

c. Intentionally causing anguish or suffering to Plaintiff and Class Members.

136. Defendant knew that an ordinary person in Plaintiff's or a Class Member's position would consider Defendant's intentional actions highly offensive and objectionable.

137. Defendant invaded Plaintiff's and Class members' right to privacy and intruded into Plaintiff's and Class Members' private affairs by intentionally misusing and/or disclosing their Private Information without their informed, voluntary, affirmative, and clear consent.

138. Defendant intentionally concealed from Plaintiff and Class Members an incident that misused and/or disclosed their Private information without their informed, voluntary, affirmative, and clear consent.

139.    As a proximate result of such intentional misuse and disclosures, Plaintiff's and Class Members' reasonable expectations of privacy in their Private Information was unduly frustrated and thwarted. Defendant's conduct, amounting to a substantial and serious invasion of Plaintiff's and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendant's intentional actions or inaction highly offensive and objectionable.

140.    In failing to protect Plaintiff's and Class Members' Private Information, and in intentionally misusing and/or disclosing their Private Information, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiff's and Class Members' rights to have such information kept confidential and private.  Plaintiff, therefore, seek an award of damages on behalf of themselves and the Class.

### FOR A THIRD CAUSE OF ACTION
### BREACH OF EXPRESS CONTRACT
### (On Behalf of Plaintiff and All Class Members)

141.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 117 above, as if fully set forth herein.

142.    Plaintiff and members of the Class allege that they entered into valid and enforceable express contracts, or were third-party beneficiaries of valid and enforceable express contracts, with Defendant.

143.    The valid and enforceable express contracts that Plaintiff and Class Members entered into with Defendant include Defendant's promise to protect nonpublic personal information given to Defendant or that Defendant gathers on its own from disclosure.

144.    Under these express contracts, Defendant and/or its affiliated healthcare providers, promised and were obligated to: (a) provide healthcare to Plaintiff and Class Members;

and (b) protect Plaintiff' and the Class Members' PII/PHI that was: (i) provided to obtain such healthcare; and/or (ii) created as a result of providing such healthcare.  In exchange, Plaintiff and members of the Class agreed to pay money for these services.

145.     Both the provision of healthcare and the protection of Plaintiff' and Class Members' PII/PHI were material aspects of these contracts.

146.     At all relevant times, Defendant expressly represented in its Privacy Notice that it is required by law to: (1) "Keep health information about you private; (2) "Give you this [Privacy] Notice of our legal duties and privacy practices with respect to health information about you," and; (3) "Follow the terms of the notice of privacy practices that is currently in effect."  Defendant further promises that it must obtain written authorization "for any category of use or disclosure that is not described above or authorized by law."[32]

147.     Defendant's express representations, including, but not limited to, express representations found in its Privacy Notice and "Patient Rights" statement, formed an express contract requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PII/PHI.

148.     Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their PII/PHI associated with obtaining healthcare private. To customers such as Plaintiff and Class Members, healthcare that does not adhere to industry standard data security protocols to protect PII/PHI is fundamentally less useful and less valuable than healthcare that adheres to industry-standard data security. Plaintiff and Class Members would not have entered

---

[32]

https://www.bjc.org/Portals/0/Content/HIPAA/BJC22094_BJC%20NPP%20COMMUNITY_fin.pdf?ver=2016-03-09-144707-350

into these contracts with Defendant and/or its affiliated healthcare providers as a direct or third-party beneficiary without an understanding that their PII/PHI would be safeguarded and protected.

149.    A meeting of the minds occurred, as Plaintiff and members of the Class provided their PII/PHI to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, protection of their PII/PHI.

150.    Plaintiff and Class Members performed their obligations under the contract, including when they paid for their health care services.

151.    Defendant materially breached its contractual obligation to protect the nonpublic personal information Defendant gathered when the information was accessed or exfiltrated by unauthorized personnel as part of the Data Breach.

152.    Defendant materially breached the terms of these express contracts, including, but not limited to, the terms stated in the relevant Privacy Notice.  Defendant did not "maintain the privacy" of Plaintiff's and Class Members' PII/PHI as evidenced by their notifications of the Data Breach to Plaintiff and Class Members. Specifically, Defendant did not comply with industry standards, or otherwise protect Plaintiff's and the Class Members' PII/PHI, as set forth above.

153.    The Data Breach was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

154.    As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received healthcare and other services that were of a diminished value to that described in the contracts.  Plaintiff and Class Members therefore were damaged in an amount at least equal to the difference in the value of the healthcare with data security protection they paid for and the healthcare they received.

155.    Had Defendant disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, the Plaintiff, the Class Members, or any reasonable person would not have accepted or purchased healthcare from Defendant and/or their affiliated healthcare providers.

156.    As a direct and proximate result of the data security incident, Plaintiff and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including without limitation the release, disclosure, and publication of their PII/PHI, the loss of control of their PII/PHI, the imminent risk of suffering additional damages in the future, disruption of their medical care and treatment, out-of-pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

157.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

### FOR A FOURTH CAUSE OF ACTION
### BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and All Class Members)

158.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 117 above, as if fully set forth herein.

159.    When Plaintiff and Class Members provided their Private Information to Defendant SFHS in exchange for Defendant's services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

160.    Defendant solicited and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

161.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

162.    Class Members accepted healthcare from, and paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to maintain adequate data security.  Defendant failed to do so.

163.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.  Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

164.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

165.    Defendant breached their implied contracts with Class Members by failing to safeguard and protect their Private Information.

166.    As a direct and proximate result of Defendant's breaches of the implied contracts, Class Members sustained damages as alleged herein.

167.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

168.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## FOR A FIFTH CAUSE OF ACTION
### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and All Class Members)

169.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 117, above as if fully set forth herein.

170.    Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff' and Class Members' Private Information.

171.    Pursuant to HIPAA (42 U.S.C. § 1302d, et seq.), Defendant had a duty to implement reasonable safeguards to protect Plaintiff' and Class Members' Private Information.

172.    Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR 164.304 definition of encryption).

173.    Pursuant to the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), Defendant had a duty to protect the security and confidentiality of Plaintiff's and Class Members' Private Information.

174.    Defendant breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act, HIPAA, and the Gramm-Leach-Bliley Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff' and Class Members' Private Information.

175.    Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

176.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

177.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

178.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

### FOR A SIXTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and All Class Members)

179.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 117, above as if fully set forth herein.

180.    In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became entrusted with, and the guardian of Plaintiff' and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiff and Class Members, (1) for the safeguarding of Plaintiff' and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of a data breach and disclosure; and (3) maintain complete and accurate records of what patient information (and where) Defendant did and does store.

181.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its patients' relationship, in particular, to keep secure the Private Information of its patients.

182.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discovery, investigate, and give notice of the Data Breach in a reasonable and practicable period of time.

183.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

184.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

185.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1).

186.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1).

187.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1).

188.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to identify and respond to suspected or known security incidents and to mitigate, to the

extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii).

189.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2).

190.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3).

191.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(94).

192.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.

193.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5).

194.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to design, implement, and enforce policies and procedures establishing physical and

administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

195.    Defendant breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

196.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual disruption of ongoing medical care and treatment; (ii) actual identity theft; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vii) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (viii) the diminished value of Defendant's services they received.

197.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## FOR A SEVENTH CAUSE OF ACTION
## MISSOURI MERCHANDISE PRACTICES ACT
## MO. REV. STAT. § 407.101, ET SEQ.
### (On Behalf of Plaintiff and Class Members)

198.    Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 117 above as if fully restated herein.

199.    Defendant is a "person" as defined by Mo. Rev. Stat. § 407.010(5).

200.    Defendant advertised, offered, or sold goods or services in Missouri and engaged in trade or commerce directly or indirectly affecting the people of Missouri, as defined by Mo. Rev. Stat. § 407.010(4), (6) and (7).

201.    Plaintiff and Class Members purchased or leased goods or services primarily for personal, family, or household purposes from Defendant.

202.    Defendant engaged in unlawful, unfair, and deceptive acts and practices, in connection with the sale or advertisement of merchandise in trade or commerce, in violation of Mo. Rev. Stat. § 407.020(1), including:

a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' Private Information, which was a direct and proximate cause of the Data Breach;

b.    Failing to identify foreseeable security and privacy risks, which was a direct and proximate cause of the Data Breach;

c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Class Members' Sensitive Information, including duties imposed by the FTC, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1302d, *et seq*., and the GLBA, 15 U.S.C. § 6801, *et seq*., which was a direct and proximate cause of the Data Breach

d.      Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class Members' Private Information, including implementing and maintaining reasonable security measures;

e.      Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff' and Class Members' Private Information, including duties imposed by Section 5 of the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1302d *et seq*., and the GLBA, 15 U.S.C. § 6801, *et seq*.;

f.      Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' Private Information; and

g.      Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1302d et seq., and the GLBA, 15 U.S.C. § 6801, et seq.

203.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Private Information.

204.    As a direct and proximate result of Defendant's unlawful, unfair, and deceptive acts and practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Personal Information.

46

205.    Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including actual damages, attorneys' fees and costs, injunctive relief, and any other appropriate relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a)  For an Order certifying this action as a class action and appointing Plaintiff and his Counsel to represent the Class;

b)  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c)  For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII and PHI compromised during the Data Breach;

d)  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e)  Ordering Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

f)  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g)  For an award of punitive damages, as allowable by law;

h)  For an award of attorneys' fees and costs, and any other expense, including expert

witness fees;

i)  Pre- and post-judgment interest on any amounts awarded; and

j)  Such other and further relief as this court may deem just and proper.


## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: June 22, 2020                    Respectfully submitted,


**PEIFFER WOLF CARR KANE & CONWAY, APLC**
By: */s/ Brandon M. Wise*
Brandon M. Wise – Mo. Bar #67242
Paul A. Lesko – Mo. Bar #51914
818 Lafayette Ave., Floor 2
St. Louis, MO 63104
Phone: 314.833.4825
bwise@pwcklegal.com
plesko@pwcklegal.com

**MASON LIETZ & KLINGER LLP**
Gary E. Mason (*pro hac vice forthcoming*)
David K. Lietz (*pro hac vice forthcoming*)
5101 Wisconsin Ave., NW, Ste. 305
Washington, DC 20016
Phone: 202.640.1160
gmason@masonllp.com
dlietz@masonllp.com

Gary M. Klinger (*pro hac vice forthcoming*)
**MASON LIETZ & KLINGER LLP**
227 W. Monroe Street, Suite 2100
Chicago, IL 60630
Tel.: (847) 208-4585
gklinger@masonllp.com

*Attorneys for Plaintiff and the Proposed Class*